**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

**TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA,**

**Plaintiff/Counter Defendant,**

**v.** **CASE NO. 3:20cv5608-MCR-ZCB**

**TALCON GROUP LLC,**

**Defendant/Counter Claimant.**
**___________________________________/**

**ORDER**

Plaintiff Travelers Property Casualty Company of America ("Travelers") issued a commercial "Installation" insurance policy to Talcon Group, LLC ("Talcon"), a company primarily engaged in underground utility contractor work. Travelers brought suit after denying Talcon's claim for coverage related to two residential construction "spec homes" that were destroyed by fire shortly before completion.[1] Travelers seeks a declaration that there is no coverage under the Installation Policy terms. Talcon filed a counterclaim for breach of contract, asserting coverage was wrongfully denied. Before the Court is Travelers' Motion

[1] The Court has diversity jurisdiction as Travelers is a Connecticut corporation with its principal place of business in Connecticut, Talcon is a limited liability corporation comprised of two members who are citizens of Florida, and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332(a). In this dispute based on diversity jurisdiction, Florida law applies.

for Summary Judgment on the Complaint and Counterclaim. Having fully reviewed the matter, the Court finds that Travelers is entitled to summary judgment.

## I. Background[2]

Travelers issued a Commercial Insurance Policy to Talcon, Policy No. QT-630-9L0-69473-TIL-19, which includes a Deluxe Property Coverage Policy and also a Commercial Inland Marine Policy covering "Installations," effective from October 29, 2019 through October 29, 2020. On May 6, 2020, within the policy period, a wildfire known as the Mussett Bayou fire, swept through Walton County, Florida. On May 11, 2020, Talcon provided Travelers a property loss notice, stating the fire had destroyed two residential construction "spec homes" it had permitted and was building in Walton County, located at 55 and 65 Woodshire Drive, Santa Rosa Beach, Florida, Lots 6 and 7. ECF No. 40–1- at 2. Travelers denied coverage on June 2, 2020, concluding that under the terms of the policy, coverage does not extend to a residential construction loss unrelated to Talcon's underground utility work.

---

[2] For the limited purposes of this summary judgment proceeding, the Court views "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party," which in this case is Talcon. *Martin v. Brevard County Pub. Sch.*, 543 F.3d 1261, 1265 (11th Cir. 2008) (internal marks omitted).

The policy declarations summarizing the Commercial Inland Marine Coverage state that the policy covers (1) "contractors equipment" as listed on a schedule; (2) "computerized business equipment" located at Talcon's business address in Havana Florida; and (3) "Installation," consisting "primarily of: Job site 2," bearing the description: "Underground utility contractor performing operations in the states of Florida, Georgia and Alabama."[3] ECF No. 40–2 at 3–4. The policy states that Travelers will pay for loss or damage to "Covered Property" from any of the "Covered Causes of Loss,"[4] and "Covered Property," in part, includes "Installation."

The policy defines "Installation" as property described in the Installation Declarations, owned by the insured or for which the insured is legally liable "that you or your subcontractors will install, erect, or fabricate at the job site" including while in transit to a job site; during and after installation, erection, or fabrication at the job site; or while at the job site, but "only if the property has been assigned to a specific job site." ECF No. 40–2 at 34 (Section F, Definitions, No. 25). The policy

[3] Section C Limits of Insurance states that the "job site" limits shown in the installation declarations apply separately to each job site for which the insured has "a specific construction contract." ECF No. 40–2 at 25.

[4] It is undisputed that fire is a covered cause of loss under the policy terms. *See* ECF No. 40–2 at 35 (Section F, Definitions, No. 36).

then defines "job site" as "the premises where the 'Installation' will be permanently located at completion of the construction, installation, erection or fabrication." *Id.* (Section F, Definitions, No. 26). The general loss condition provisions provide, in relevant part, that Travelers "will not pay [the insured] more than [its] financial interest in the Covered Property." ECF No. 40–2 at 11. For an "Installation" loss, Travelers values the "Covered Property" based on the actual or replacement value of property the insured owns or the value of "Covered Property for which you are legally liable," not to exceed the replacement cost. *Id.* at 28. Also, the policy sets out that "Installation" coverage ends either when the policy expires or is cancelled, or when "[the insured's] interest ceases." *Id.* at 27.

In applying for the 2019–2020 renewal policy, Talcon described its work on a Heavy Construction Template. Talcon represented that 98 to 99% of its work was as a general contractor for underground utility work, and "site development" was listed as accounting for the other 1 to 2% of its work. Current projects were listed as 100% Municipal/Government with 0% residential or commercial. ECF No. 40–4 at 69. As examples of Talcon's then-current jobs, it listed the replacement of underground sewer lines along Nine Mile Road in Pensacola, Florida, and running a waterline to the Three Mile Bridge in Pensacola. Talcon represented that its future jobs would "continue to focus on placing underground water, sewer, and drainage

lines in Pensacola and Tallahassee." *Id.* at 70. Talcon submitted the coverage claim for the value of the spec homes, not for damage to any equipment it owns.

Gary Wallace, an Account Executive Officer of Travelers engaged in underwriting policies, stated by affidavit that Installation Coverage is a separate class of coverage intended to insure against the loss of damage for property or equipment that a contractor owns or is installing at a job site. He explained that the appropriate policy type for ground-up construction of commercial or residential buildings would be a "Builder's Risk" policy. ECF No. 40–12 at 3. He further explained that "[t]hese two different classes of coverage are written on different exposure bases." *Id.* As to this case, Wallace was the underwriter who handled the policy renewal in 2019. He testified by deposition that when the fire claim came in, he received a call from the claims representative, Shawn Webb, who asked whether the file included any indication of an intent to cover residential construction. Wallace confirmed that the file did not, and he testified that Travelers had not been asked to cover residential construction and that nothing in the file or renewal documents indicated Talcon was involved in residential construction. *See* ECF No. 44–1 at 27–28 (Wallace Depo. at 26–27).

Talcon is owned by Rick and Shannon Nesius; Rick is the manager. The residential construction at issue was located on two lots owned by their family trust,

the Nesius Charitable Remainder Unitrust. According to Rick Nesius, Talcon has no interest in the land held within the trust. ECF No. 42–1 at 22–23. He testified by deposition that that he never sought to have these properties listed or added to the Travelers policy because he thought it was covered as a job site. He maintains that Talcon had an interest as the general contractor for this residential construction because son Zack Nesius, a licensed general contractor for the company, obtained the permits through his Talcon-affiliated contractor's license. Rick testified that it was his intent to let his son Zack manage the project, and he loaned Zack money for this purpose but said he personally kept an eye on the bills and intended to make Talcon ultimately responsible to ensure that all the bills were paid. *See* ECF No. 42–1 at 40–43. Rick said he borrowed money to finance the construction in a line of credit through Nesius Partnership. Somewhat inconsistently, he testified that Talcon did not pay for any expenses incurred in building these homes and yet Talcon was "financially responsible." ECF No. 42–1 at 40, 43. Rick acknowledged that no written contract exists to show Talcon was the general contractor.

Zack Nesius explained that he obtained the permit with his Talcon-affiliated general contractor's license and that he was paid by Talcon by being a part owner and he would receive a percentage of the profits from the sale of the homes. The permit applications all show Zack Nesius as the contractor and list his address—not

Talcon's address as stated in the Travelers policy. Zack testified that he used several accounts to pay subcontractors (including his own account, his wife's personal account, and the account of his company, Nesius Building) and said one also could have been a Talcon account, although he did not have authority to pay anyone using a Talcon account. ECF No. 45–1 at 56. Zack testified that all suppliers, materialmen and workers were paid for the project. *Id* at 57. When asked what individuals were paid directly by the Talcon Group, Zack could not answer, and when asked how he knew that even occurred, he answered, "I don't." ECF No. 45–1 at 60.

## II. Discussion

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing on the record that there is no genuine dispute of fact and that the plaintiff has failed to establish an element essential of the claim. *See Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1313 (11th Cir. 2007); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If this burden is satisfied, then the nonmoving party must go beyond the pleadings and "designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. The Court views all evidence in the light most favorable to the party opposing the motion and draws all reasonable inferences in favor of the non-

movant "to the extent supportable by the record." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007)). A fact is not material unless "it would affect the outcome of the suit under the governing law." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008). Moreover, "credibility determinations, the weighing of evidence, and the drawing of inferences from the facts" are matters left to the jury. *Graham v. State Farm Mut. Ins. Co*., 193 F.3d 1274, 1282 (11th Cir. 1999). There is no genuine issue for trial, however, and summary judgment is proper, if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Contract interpretation is generally a question of law. *See Lawyers Title Ins. Corp. v. JDC (Am.) Corp.,* 52 F.3d 1575, 1580 (11th Cir. 1995). "Questions of fact arise only when an ambiguous contract term forces the court to turn to extrinsic evidence of the parties' intent, such as precontract negotiations, to interpret the disputed term." *Id.* The terms of the contract itself provide "the best evidence of the parties' intent." *Key v. Allstate Ins. Co*., 90 F.3d 1546, 1549 (11th Cir. 1996). Where a provision is ambiguous and subject to conflicting reasonable interpretations, "parol evidence is admissible to 'explain, clarify or elucidate' the

ambiguous term." *Strama v. Union Fid. Life Ins. Co*., 793 So. 2d 1129, 1132 (Fla.1st DCA 2001) (quoting *Friedman v. Va. Metal Prods. Corp*., 56 So. 2d 515, 517 (Fla. 1952)). Determining whether a contract provision is ambiguous is a question of law, and, if the facts are not in dispute, the ambiguity can be resolved as a matter of law as well. *See id*.

When interpreting an insurance policy under Florida law, courts follow "the generally accepted rules of construction," meaning the contract terms are construed according to their "plain meaning, with any ambiguities construed against the insurer and in favor of coverage." *Penzer v. Transp. Ins. Co*., 29 So. 3d 1000, 1005 (Fla. 2010) (internal quotation marks omitted). A policy is only considered ambiguous if its "language is susceptible to more than one reasonable interpretation, one providing coverage and another limiting coverage." *Id.* (quoting *Garcia v. Fed. Ins. Co*., 969 So.2d 288, 291(Fla.2007)). A policy is not ambiguous simply because it is complex or requires analysis, and a clear and unambiguous provision must be enforced according to its terms. *Id.*; *see also Lawyers Title*, 52 F.3d at 1580 (citing Florida law). If a policy provision is found to be ambiguous, it is "construed in favor of the insured and strictly against the drafter." *Swire Pac. Holdings, Inc. v. Zurich Ins. Co*., 845 So. 2d 161, 165 (Fla. 2003). Importantly, "in construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its

full meaning and operative effect." *Id.* (quoting *Auto–Owners Ins. Co. v. Anderson*, 756 So.2d 29, 34 (Fla. 2000)).

Travelers asserts that there is no coverage because this Installation policy unambiguously does not cover Talcon's work building residential homes from the ground up. On careful review, the Court agrees. The plain terms of the Installation policy cover Talcon's work as an underground utility contractor: "The property installed consists primarily of: Job site 2" described as "underground utility contractor performing operations in . . . Florida." ECF No. 40–2 at 3–4. Work that cannot be considered primarily underground utility contractor work, is not within the scope of the policy. Notably, there is no argument that Talcon was "primarily" performing operations as an underground utility contractor at the residential construction sites or that it performed *any* underground utility work there for that matter. There is also no suggestion that Talcon owned the property or any equipment at the residential construction sites that was damaged in the fire.

Talcon contends that the policy's use of the word "primarily" when describing the underground utility work as the "Installation" is ambiguous because "primarily" is not synonymous with "exclusively." Talcon argues, the term "primarily" could reasonably mean that its primary work is a covered Installation but that other types of work are also covered, even if unrelated to Talcon's primary work. The Court

finds that this interpretation is not reasonable given the context. Such an interpretation would leave an insurer vulnerable to risks that it did not contemplate and were not disclosed. Because coverage and the "covered property" are tied to the description given in the Declarations, use of the term "primarily" cannot be read in isolation in a manner that would basically untether that description and allow coverage for a completely different type of work with different risks.

Talcon also argues that the definition of "Installation" in the Declarations is inconsistent with the generic definition of "Installation" given a few pages later, and thus, the broader reading of the generic definition should be applied in favor of coverage. The Court does not agree that there is any inconsistency or ambiguity. The first sentence of the generic definition of "Installation" expressly refers to and incorporates the "Property *described in the Declarations*" if "owned by you or property of others for which you are legally liable, that you or your contractors will install, erect or fabricate at the job site." ECF No. 40–2 at 4 (emphasis added). The generic definition next excludes buildings at the job site that existed before the policy was in effect. According to Talcon, this exclusion means that buildings it erected at a job site after the start of the policy should be covered. Talcon's interpretation improperly reads second phrase in isolation and ignores the first sentence that incorporates the Declarations. Reading the policy as a whole, there is no ambiguity

because the generic definition is prefaced by, and must be construed in light of, "the property described in the Declarations." In this case, that consists of installations primarily consisting of underground utility work. Again, there is no contention that the residential homes at issue were erected primarily for—or in any way related to—Talcon's underground utility work. The permitting documents show that permits were received to connect the homes to already existing utilities.

Even assuming the term "primarily" in the declarations could be found to inject some ambiguity into the policy (although the Court does not agree), the Court could then consider parol evidence to interpret the term. The undisputed record demonstrates that Talcon did not at any time give notice in its policy application that it might sometimes perform residential construction from the ground up. Travelers' underwriter, Wallace, testified that such work would entail different risks and different considerations and that a Builder's Risk policy would be appropriate in that instance. Wallace also testified that he was not asked for a Builder's Risk policy, but that Talcon sought an Installation policy. Significantly, its renewal application represented in the Heavy Construction Template that its business consisted 100% of underground utility contract work—specifically, 98 to 99% underground utilities

and 1 to 2% site preparation.[5] Talcon maintains that the statement was true at the time it was made, which the Court accepts. But the insurance file contains no evidence that Talcon (prior to the fire) ever informed Travelers otherwise when it decided to obtain a permit for residential construction.[6] Thus, the policy's plain language and all surrounding circumstances confirm that the phrase, "The property installed consists primarily of . . . underground utility contractor" performing operations in Florida, is not ambiguous and cannot be reasonably construed as creating coverage for a completely different type of construction work, namely, ground-up residential construction.

Travelers also argues that the claim was outside the scope of coverage because Talcon has not demonstrated it had any financial interest in the property. The plain language of the policy states that Travelers "will not pay you more than your financial interest in the Covered Property." ECF No. 40–2 at 11. Talcon states it was "legally liable" and thus had a financial interest as the general contractor,

[5] Wallace testified that site preparation would include "[g]rading or preparing a site for them to do a utility installation." ECF No. 44–1 at 35. Webb testified that he told Talcon's insurance agent, Dale Waldorff, that "the policy is set up to cover underground [utility] installation work," and that he did not find the construction of a residential home to be similar. ECF No. 41–1 at 19–20.

[6] To the extent Talcon argues that it did not submit a new Heavy Construction Template with its 2019 renewal but that its agent simply resubmitted the 2018 form—asserting Talcon made no misrepresentation—that argument does not create a question of fact as to Travelers. Instead, Talcon's recourse, if any, would be against the agent.

arguing the testimony of Rick and Zack Nesius create a question of fact. Rick proclaimed that Talcon was "financially responsible" and Zack maintained that he "pulled the permit" on his Talcon general contractor's license. These statements, without more, do little to demonstrate that Talcon had a financial interest in any property on the site. Talcon has produced no evidence to substantiate a claim of ownership or any contract demonstrating a financial interest in the construction as the general contractor. There is no claim for legal liability against Talcon. Zack is listed as the general contractor on the permits and they do not reference Talcon or its address. He also indicated that the subcontractors had been paid. Rick intended Talcon to be responsible if any bills were left unpaid, but all of this is a mere scintilla of evidence that fails to substantiate that Talcon had a financial interest in the spec homes, even assuming the residential structures could be considered "covered property."

The Court has considered all remaining arguments and finds them to be without merit. In sum, the contract is unambiguous and the value of residential home construction work is not within the scope of this Installation coverage for underground utility contractor operations, and even if it was, there is no evidence that Talcon had a financial interest in the "spec homes." The Court cannot create coverage where none exists. Because the policy did not cover the "spec homes,"

there also is no breach of contract, and Travelers is entitled to summary judgment on its claim as well as the counterclaim.

Accordingly:

1. Travelers' Motion for Summary Judgment, ECF No. 40, is **GRANTED**.

2. The Clerk is directed to enter declaratory judgment in favor of Travelers and against Talcon on the Complaint as follows: The Court declares that there is no coverage under the Travelers Policy referenced in the Complaint for the losses at issue because the two described residential single-family homes are not Covered Property under the Installation policy terms.

3. The Clerk is also directed to enter judgment in favor of Travelers and against Talcon on the Counterclaim.

4. Costs are to be taxed against Talcon.

5. The Clerk is directed to close the file.

**DONE AND ORDERED** this 26th day of September 2022.

*M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**