**UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

December 20, 2023

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 22-13547-CC
Case Style: Travelers Property Casualty Company of America v. Talcon Group LLC
District Court Docket No: 3:20-cv-05608-MCR-ZCB

Electronic Filing
All counsel must file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Although not required, non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing are available on the Court's website.

Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, Each Party to Bear Own Costs.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

Clerk's Office Phone Numbers

| | | | |
|---|---|---|---|
| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

OPIN-1A Issuance of Opinion With Costs

[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

---

No. 22-13547

---

TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA,

Plaintiff-Appellee,

*versus*

TALCON GROUP LLC,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 3:20-cv-05608-MCR-ZCB

---

Before GRANT, ABUDU, and HULL, Circuit Judges.

HULL, Circuit Judge:

This appeal centers on whether two residential homes destroyed by a fire while under construction were covered under an insurance policy (the "Policy") issued by Travelers Property Casualty Company of America ("Travelers") to its named insured, Talcon Group LLC ("Talcon"). Talcon is an underground utility contractor for sewer, storm drains, and treatment plants. The Policy, when viewed together with Talcon's insurance application as required by Florida law, unambiguously provides coverage for only underground utility operations and the site development work tied to those operations. The Policy's scope of coverage did not extend to the construction of the two homes.

Accordingly, after reviewing the record and the parties' briefs, and with the benefit of oral argument, we affirm the district court's summary judgment in favor of Travelers.

## I. TWO RESIDENTIAL HOMES

### A. Land and Construction Costs

Talcon is one of several entities owned by the Nesius family, with parents Rick and Shannon Nesius, along with their son Zack, operating as Talcon's owners. Rick testified that "[a]lmost every bit" of Talcon's work was underground utilities, such as sewers, storm drains, and treatment plant work.

Talcon did not own the Florida land on which the two residential homes were constructed. Instead, the land was owned

by a different family entity, the Nesius Charitable Remainder Unitrust (the "Unitrust"). Shannon was the only trustee of the Unitrust, and its beneficial owners were Shannon, Rick, and a church. Talcon had no involvement in the Unitrust.

Additionally, Talcon did not loan money or pay for materials for the construction of the two residential homes. To finance the construction of the two homes, Rick secured a line of credit through a third family entity, the Nesius Family Limited Partnership (the "Partnership"), but funds from Zack's wife were also used. Materials were sourced from places where Talcon had credit, but Zack did not have the authority to pay for materials using Talcon's accounts. Rather, Zack paid subcontractors and the material suppliers using money, separate from Talcon, through his personal account, his wife's personal account, and an account for a fourth family entity, the Nesius Building Company, Zack's now-defunct construction company.

There was an oral agreement to split the profits from the sale of the two residential homes between the Unitrust, the Partnership, Zack, and Zack's wife. Rick stated that he planned to determine the profit split after the homes were sold. Talcon was to benefit from the sale of the two residential homes by becoming a "local vendor" in the county where the homes were being constructed, entitling it to a 5% advantage with other contractors when bidding on future projects in the county. While it was far from firm, there was also a potential that Talcon might receive a share of the profits from the sale of the two residential homes.

Zack was responsible for the day-to-day supervision of the construction of the two residential homes, and he obtained the building permits for them. The permits list Zack as the general contractor and the Unitrust as the owner. The permits, however, do not mention Talcon. Rick testified that building permits can be issued in only an individual's name, not in an entity's name, but that Zack obtained the building permits for the residential homes using his Talcon affiliated general contractor license.

### B. Wildfire Peril

In May 2020, a wildfire completely destroyed the two residential homes. At that time, the residential homes were mostly complete but did not have certificates of occupancy.

Talcon then provided Travelers with a property loss notice, stating that the two residential homes were lost in the wildfires. Travelers did not dispute that fires are covered perils under the Policy. Travelers, however, denied the claim, stating in part that "[t]he construction of two single family homes is not the same type [of] work as the installation of underground utility contractor work, which is what Travelers agreed to cover; therefore, the two homes you constructed which were damaged by the fire are not Covered Property under the . . . [P]olicy." Thus, we turn to Talcon's application for the Policy and the Policy itself.

## II. THE POLICY

In 2019 in Florida, Talcon, through an insurance agent, submitted a "Commercial Insurance Application" with Travelers. Talcon's application was for a renewal of a 2018 policy with

Travelers. In an application field titled "Description of Primary Operations," Talcon listed "[u]nderground utility contractor." Under the "Installation/Builders Risk Section," Talcon selected "Installation," indicated that it averaged three <u>commercial</u> projects each year, and left blank a section to list the number and value of any <u>residential</u> projects. An e-mail to Travelers submitting the renewal application stated that Talcon conducted "predominately water and sewer line work," and that a "heavy contractor questionnaire" was attached to explain Talcon's exposures.

On the attached "Heavy Construction Template," which was a part of Talcon's renewal application, Talcon indicated that it engaged in 98%-99% "Underground Utility" work and 1%-2% "Site Development" work.[1] Talcon also indicated that the "[c]urrent breakdown of work" was 100% "Municipal/Government" and 0% "Residential." As examples of past or present projects, Talcon listed "[r]eplacement of underground sewer lines along Nine Mile Rd" and "[r]unning water line to 3 mile bridge." Talcon also indicated that it had no known future projects but "w[ould] continue to focus on placing underground water, sewer, and drainage lines in Pensacola and Tallahassee."

In August 2019, Talcon submitted its renewal application. Talcon does not dispute that construction of the two residential

---

[1] The only evidence in the record as to what "site development" means comes from the testimony of an underwriter for Travelers, who stated that it entailed "[g]rading or preparing the site for [Talcon] to do a utility installation." Talcon does not dispute this characterization.

homes began prior to its renewal application, and it failed to disclose this residential construction in that application.[2]

Ultimately, Travelers issued Talcon a policy extending from October 29, 2019 to October 29, 2020. Among other coverage, the Policy covered "Installation" property from direct physical loss or damage. Two provisions in the Policy are relevant to the interpretation of the term "Installation."

First, the Policy "Definitions" section. The Policy defined "Installation" as "[p]roperty described in the Declarations under 'Installation' owned by you or property of others for which you are legally liable, that you or your subcontractors will install, erect or fabricate at the 'job site.'" This definition excluded "[b]uildings or structures that existed at the 'job site' prior to the inception of this policy." The Policy defined "[j]ob site" as "the premises where the 'Installation' will be permanently located at completion of the construction, installation, erection or fabrication."

The second relevant provision is the Policy "Declarations" section. The Declarations stated that "[t]he property installed consists primarily of:" followed by lines reading "Location, Description and Coinsurance Percentage" and on the next page "Covered Property and Limits of Insurance Continued." (font

---

[2] When Talcon submitted its renewal application in 2019, it attached the same Heavy Construction Template from its 2018 application. Rick Nesius testified that because Talcon had begun constructing the two residential homes at the time of its renewal application, the Heavy Construction Template was no longer accurate.

altered.) Under this second line, the following three items appear: (1) "'Job Site' 2"; (2) "Description Underground utility contractor performing operations in the states of Florida, Georgia, and Alabama"; and (3) "Coinsurance Percentage 0%." The Policy does not define or describe Job Site 2.

## III. PROCEDURAL HISTORY

Travelers filed a complaint seeking a declaratory judgment that the two residential homes were not covered property under the Policy. Talcon answered and filed a breach-of-contract counterclaim against Travelers for denying Talcon's claim.

Travelers then filed a motion for summary judgment, arguing, in relevant part, that the Policy coverage did not extend to the two residential homes. Travelers acknowledged that the Policy used the word "primarily" to describe property covered under the term "Installation," but it argued that coverage could not extend to undisclosed business activities unrelated to Talcon's underground utility work.

Talcon responded that the extent of coverage under the Policy was ambiguous because (1) the Policy used the word "primarily" to describe property covered under the term "Installation"; and (2) the Policy defined "Installation" as excluding buildings that predated the Policy, which suggested that it covered buildings constructed after the Policy began, like the two residential homes.

The district court entered summary judgment in favor of Travelers. Relevant to this appeal, the court determined that the

Policy unambiguously did not cover the construction of the two residential homes because (1) the plain terms of the Policy covered primarily underground utility contractor work; and (2) work that cannot be considered primarily underground utility work—such as construction of the two residential homes—was beyond the scope of coverage.[3] The court further explained that it would be unreasonable to read in isolation the Policy's use of "primarily" to describe covered property. Doing so, the court determined, would expose Travelers to risks that it did not contemplate and that Talcon did not disclose.

The court also reasoned that although the definition of "Installation" excluded coverage for buildings that existed prior to the Policy, this exclusion did not suggest that new buildings were covered. The court determined that this exclusion had to be read in the context of the entire definition of "Installation," which incorporated "property described in the Declarations," *i.e.*, installations primarily consisting of underground utility work.

Because the two residential homes were unrelated to Talcon's underground utility work, the court concluded that the Policy did not cover them. And because the Policy did not cover the two residential homes, the court ruled that Travelers did not

[3] As an alternative basis for its summary judgment, the district court found that Talcon had no financial interest in the two residential homes. Because we affirm the district court's main ground for entering judgment—that the Policy unambiguously did not cover the construction of two residential homes—we need not discuss this alternative finding.

breach the Policy by denying Talcon's claim. Accordingly, the district court entered judgment in favor of Travelers on its complaint and Talcon's counterclaim, declaring that the Policy's coverage did not extend to the construction of the two residential homes. Talcon timely appealed.

## IV. STANDARDS OF REVIEW

We review *de novo* a district court's grant of summary judgment, viewing the evidence and drawing all reasonable inferences in the light most favorable to the non-moving party. *Crane v. Lifemark Hosps., Inc.*, 898 F.3d 1130, 1133-34 (11th Cir. 2018). We also review *de novo* the interpretation of an insurance policy. *Hallums v. Infinity Ins. Co.*, 945 F.3d 1144, 1148 (11th Cir. 2019).

## V. DISCUSSION

### A. Florida Law

When construing an insurance policy under Florida law,[4] courts "read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 166 (Fla. 2003) (quotation marks omitted). In doing so, courts must "avoid simply

---

[4] The Policy has no choice-of-law provision. Florida law applies here, as the parties acknowledge, because this is a diversity case where we apply the law of the forum. *See Shiloh Christian Ctr. v. Aspen Specialty Ins. Co.*, 65 F.4th 623, 627 n.2 (11th Cir. 2023); *Ins. Co. of N. Am. v. Lexow*, 937 F.2d 569, 571 (11th Cir. 1991) ("In a diversity case, a federal court applies the substantive law of the forum state, unless federal constitutional or statutory law is contrary.").

concentrating on certain limited provisions to the exclusion of the totality of others." *Wash. Nat'l Ins. v. Ruderman*, 117 So. 3d 943, 948 (Fla. 2013) (quotation marks omitted). "Courts are to give effect to the intent of the parties as expressed in the policy language, and if the policy is ambiguous, the ambiguity must be resolved liberally in favor of the insured and strictly against the insurer who prepared the policy." *Prudential Prop. & Cas. Ins. Co. v. Swindal*, 622 So. 2d 467, 472 (Fla. 1993). However, this rule of construing an ambiguous policy in the insured's favor applies only if the ambiguity "remains after resort to the ordinary rules of construction." *Ruderman ex rel. Schwartz v. Wash. Nat'l Ins.*, 671 F.3d 1208, 1211 (11th Cir. 2012) (quotation marks omitted). A policy is ambiguous only if its "language is susceptible to more than one reasonable interpretation, one providing coverage and another limiting coverage." *Penzer v. Transp. Ins. Co.*, 29 So. 3d 1000, 1005 (Fla. 2010) (quotation marks omitted).

Under Florida law, however, our review is not limited to the four corners of an insurance policy. Instead, "[e]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy and as amplified, extended, or modified by any application therefor . . . ." Fla. Stat. § 627.419(1). "This statute has been construed to mean that '[t]he application becomes a part of the agreement between the parties and the policy together with the application form the contract of insurance.'" *Nugget Oil, Inc. v. Universal Sec. Ins. Co.*, 584 So. 2d 1068, 1070 (Fla. Dist. Ct. App. 1991) (alteration in original) (quoting *Mathews v. Ranger Ins. Co.*, 281 So. 2d 345, 348 (Fla. 1973)).

**B. Analysis**

On appeal, Talcon argues that the district court erred by ruling that the Policy unambiguously did not cover the construction of the two residential homes. We disagree.

First, the Policy defines "Installation" as "[p]roperty described in the Declarations" that Talcon owned or for which it was legally liable. The Declarations then tee up the issue of coverage—"[t]he property installed consists primarily of[.]" The subsequent two lines of text read "Location, Description and Coinsurance Percentage" and "Covered Property and Limits of Insurance Continued." And below that are three entries—"'Job site' 2," "[u]nderground utility contractor performing operations in Florida," and "Coinsurance Percentage 0%"—none of which describe property.

Under "Covered Property," the Policy provides a location, "'Job site' 2," and an entity, "[u]nderground utility contractor." From this we see from the Policy alone that "Covered Property" is property installed at "'Job site' 2" by an "[u]nderground utility contractor."

In addition, our review is not limited to the four corners of the Policy.[5] When the Policy is read together with Talcon's

---

[5] On appeal, Talcon refers to the Heavy Construction Template as "parol evidence," which is also known as extrinsic evidence. *See Shiloh Christian Ctr.*, 65 F.4th at 627. Under Florida law, extrinsic evidence generally may not be used to interpret insurance policies. *See id.* at 627-28, 629 n.3. However, as Talcon concedes, the Heavy Construction Template was part of its renewal

renewal application, the only reasonable interpretation is that the scope of coverage did not extend to the construction of the two residential homes.

In its renewal application, Talcon represented that it performed only two types of work: (1) "Underground Utility," which constituted 98%-99% of its work; and (2) "Site Development," which constituted 1%-2% of its work. Talcon also listed past and present projects consisting of underground utility work—replacing underground sewer lines and running water lines to a bridge. And while it did not specify any future projects, it emphasized that it "w[ould] continue to focus on placing underground water, sewer, and drainage lines."

Further, Talcon's renewal application does not state or even hint that Talcon had or would engage in residential work. While Rick and Zack testified that Talcon constructed multiple residential homes in recent years, Talcon's renewal application did not include this past residential work or indicate the prospect of future residential construction. And even though Talcon had begun constructing the two residential homes relevant to this appeal at the time of the renewal application, it (incorrectly) represented to Travelers that it was not engaged in any residential construction.

---

application. Therefore, under Florida law, the Heavy Construction Template and the rest of the renewal application are not extrinsic evidence but rather, together with the Policy, "form the contract for insurance" we must review. *See Nugget Oil, Inc.*, 584 So. 2d at 1069-70 (quotation marks omitted); Fla. Stat. § 627.419(1).

Instead, Talcon stated that 0% of its current work was "Residential" and 100% was "Municipal/Government."

We recognize that Talcon argues that the Policy's use of "primarily" in describing covered property indicated that the Policy did not cover only underground utility work. Tellingly, viewing Talcon's renewal application together with the Policy clarifies the Policy's use of "primarily." As stated above, Talcon represented in its renewal application that it engaged in only two types of work, the overwhelming majority of which was its underground utility operations. But the application also provides that Talcon engaged in site development work. Knowing this, the Policy is best read as extending coverage to Talcon's primary operations—underground utility work—*and* to its site development work, the only other type of work described in the application.[6] Not only does such a reading make sense of the use of "primarily," it does so by tying this term to the remainder of the Policy and renewal application. *See Swire Pac. Holdings, Inc.*, 845 So. 2d at 166; Fla. Stat. § 627.419(1). In contrast, Talcon's reading—that "primarily" refers to its underground utility work but suggests other, unspecified, very different work on residential homes would also be covered—is unreasonable because it isolates a single word and ignores the

[6] Notably, Talcon does not argue that construction of the two residential homes constituted site development. And the undisputed record evidence indicates that Talcon's "site development" work constituted preparatory work for its underground utility operations.

broader context of the Policy and the renewal application. *See Ruderman*, 117 So. 3d at 948.

Talcon also contends that because the definition of "Installation" excluded preexisting buildings, coverage extended to the construction of new buildings like the two residential homes. This exclusion to buildings predating the Policy, however, does not suggest that coverage extended to the construction of the two residential homes. *See Intervest Constr. of Jax, Inc. v. Gen. Fid. Ins. Co.*, 133 So. 3d 494, 498 (Fla. 2014) (providing that exclusionary clauses can be helpful in construing an insurance policy's coverage but "cannot be relied upon to create coverage" (quotation marks omitted)). Viewing the Policy and the renewal application together, this exclusion at most suggests coverage for buildings constructed after the Policy took effect, *if* such buildings were part of Talcon's underground utility or site development work. For example, Shawn Webb, a claims adjuster at Travelers, testified that construction of a "pump house" related to Talcon's underground utility work would appear to be covered under the Policy. Talcon does not contend on appeal that the two residential homes were such a building. And as the district court noted, Talcon did not argue that it performed any underground utility work relating to the construction of the two residential homes.

Talcon's interpretation of this exclusion also helps to illustrate why its reading of the Policy is both unbounded and unreasonable. Talcon's reading would seemingly require Travelers to cover any one-off construction project wholly

unrelated to Talcon's underground utility or site development work—again, the only types of work disclosed by or provided in the renewal application and Policy. If this exclusion extended coverage to the construction of the two residential homes, it would also extend coverage to any assortment of undisclosed types of work carrying different types of risk. Coverage would follow if Talcon decided to install a skylight at a mall, repair the roof of a church, or construct a skyscraper from the ground up. Travelers would be on the hook for any number of such projects, even though they were not disclosed in Talcon's application, contemplated by Travelers, or provided for in the Policy. Taken as the whole, the Policy and Talcon's renewal application do not support such a reading. *See Intervest Constr. of Jax, Inc.*, 133 So. 3d at 497 ("Courts may not rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." (quotation marks omitted)).

Instead, the only reasonable reading of the Policy and the renewal application is that Travelers provided coverage for Talcon's underground utility and site development work. The construction of the two residential homes is neither of those items and is not covered by the Policy.

## VI. CONCLUSION

For the above reasons, we affirm the district court's entry of judgment in favor of Travelers.

**AFFIRMED.**